UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------------x
                                                    :
                                                    :
NATURAL RESOURCES DEFENSE COUNCIL, INC.,            :
                                                    :
        Plaintiff,                                  :      Civ. No. 10 Civ. 7647 (SAS)
                                                    :      ECF Case
   - v. -                                           :
                                                    :
FEDERAL HOUSING FINANCE AUTHORITY,                  :
EDWARD DEMARCO, ACTING DIRECTOR,                    :
FEDERAL HOUSING FINANCE AUTHORITY,                  :
OFFICE OF THE COMPTROLLER OF THE                    :
CURRENCY, a component of the UNITED STATES          :
DEPARTMENT OF THE TREASURY, and JOHN G.             :
WALSH, ACTING COMPTROLLER OF THE                    :
CURRENCY,                                           :
                                                    :
        Defendants.                                 :
                                                    :
-----------------------------------------------------------------------x
```

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTORY STATEMENT**

1. Energy efficiency is the most expeditious and cost effective solution to America's pressing energy problems, from combating global warming, to increasing reliability of the electric grid, to reducing consumer energy bills. But fully tapping into this resource requires overcoming a number of barriers. Access to financing is one key barrier: many more Americans could better afford to pay for energy efficiency and other clean energy retrofits to their homes or businesses if they had access to financing that was simple to procure and reduced their upfront costs.

2. To address the problem that property owners face in trying to finance energy efficiency and renewable energy improvements to their homes and businesses, twenty-three

1

states and the District of Columbia have authorized the development of municipal financing initiatives known as Property Assessed Clean Energy ("PACE") programs.  PACE programs allow local governments to offer financing to commercial and residential property owners to fund the upfront costs of energy efficiency and on-site renewable energy projects, using the proceeds of municipal or special revenue bonds, government grants, or other funding sources that may be available.

3. Property owners who opt to use a PACE program to finance these projects agree to pay an incremental charge on their property taxes over an extended term of up to 20 years (but no longer than the useful life of the financed improvements).  Energy efficiency improvements to a residence or business decrease the building's energy bills, increasing the property owner's cash flow and leading to reduced risk of default and foreclosure.  Energy efficiency and clean energy improvements should also increase the value of the improved property.

4. Typical PACE financed projects include the installation of new windows, improved insulation, improved central heating/cooling systems, water efficiency, and small-scale on-site renewable energy projects.  Like other forms of land-secured tax assessments, PACE assessments attain first lien priority, a feature that is crucial to structuring capital markets financing acceptable to both rating agencies and PACE bond investors.

5. On October 18, 2009, the White House together with relevant federal agencies issued a policy framework on PACE financing programs touting the benefits of these programs.  The policy framework highlighted the federal government's role in supporting the implementation of PACE programs through American Recovery and Reinvestment Act ("ARRA") funding.  More than $150 million in ARRA funding was appropriated to support PACE programs including $40 million for programs in the State of New York.  The policy

framework also recommended the adoption of best practices to ensure the success of PACE programs, and to protect the interests of property owners and existing mortgage lenders.

6. On May 7, 2010, the Department of Energy ("DOE") issued best practice guidelines implementing the White House's October 18 Policy Framework. DOE described its proposed guidelines as "significantly more rigorous than the underwriting standards currently applied to land-secured financing districts."

7. Despite the considerable efforts occurring at the federal, state, and local level to develop and implement effective and appropriate PACE programs, on July 6, 2010, Defendant the Federal Housing Finance Authority ("FHFA"), issued a Statement calling for a "pause" in PACE programs. A copy of FHFA's July 6 Statement is attached as Exhibit A. Although FHFA's Statement purported to make a number of factual findings regarding the risks posed by the first lien status of PACE assessments, FHFA provided no evidence to support its purported factual findings, and many of the findings were inaccurate and at odds with conclusions of DOE's best practice guidelines for PACE financing programs.

8. In its July 6 Statement, FHFA, which is charged with regulating the Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Home Loan Banks, directed Fannie Mae, Freddie Mac, and the Federal Home Loan Banks to take a number of specified actions adverse to the development of PACE programs. The impact of FHFA's statement was to halt the implementation of PACE programs in municipalities across the nation.

9. The same day, July 6, 2010, Defendant the Office of the Comptroller of the Currency ("OCC"), which oversees the national banks, issued a Bulletin on PACE financing. A copy of OCC's July 6 Bulletin is attached as Exhibit B. The OCC Bulletin attached FHFA's July

3

6 Statement and directed national banks to take actions that would effectively preclude homeowners with first lien priority PACE assessments from obtaining mortgages (or refinancing existing mortgages) through any of the national banks.

10. On August 31, 2010, pursuant to FHFA's July 6 Statement, Fannie Mae and Freddie Mac issued guidance letters confirming that they would no longer purchase mortgages secured by properties with PACE assessments that permit priority over first mortgage liens, and refusing to refinance mortgages secured by properties with existing first lien PACE assessments unless the PACE obligations are paid off in full (except in very limited circumstances). Together, Fannie Mae and Freddie Mac own or guarantee approximately half of the home loans in the United States. By causing the owners or guarantors of half the U.S. home loans to deny secondary market benefits to properties that are, or may in the future be, financed by PACE assessments with first lien priority, an essential feature of PACE programs, FHFA's July 6 Statement had the effect of stopping localities and states from moving forward with adopting or implementing PACE programs.

11. Defendants' July 6, 2010 Statement and Bulletin (collectively "Defendants' July 6 Directives"), which collectively mandated an effective end to all residential PACE programs, constitute rules within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

12. Neither FHFA nor OCC provided notice to the public or an opportunity to comment on Defendants' July 6 Directives. Nor did Defendants conduct any analysis of the environmental impacts that their July 6 Directives could have.

13. By issuing their July 6, 2010 Directives without engaging in notice and comment rulemaking and by basing their decisions to curtail PACE financing programs on unsupported

4

and inaccurate factual assertions, Defendants violated the procedural and substantive requirements of the APA, 5 U.S.C. §§ 551, *et seq.*  Moreover, by failing to undertake any analysis of the environmental impacts that Defendants' July 6 Directives could have, Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231 *et seq.*

14. NRDC seeks a judgment declaring that Defendants' issuance of their July 6 Directives on PACE financing violates the law, and an injunction ordering Defendants to vacate the Directives.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 5 U.S.C. §§ 702, 706 (Administrative Procedure Act).

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(3) because plaintiff NRDC maintains its principal place of business in this district.

17. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201, and this Court has the authority to grant declaratory, injunctive, and any additional relief pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706.

## PARTIES

18. Plaintiff NRDC is a national, not-for-profit membership corporation with its principal place of business in New York, New York.  NRDC has more than 447,000 members nationwide, including over 39,000 members in New York State, and at least 19,000 members in localities within New York State that have adopted or are currently considering the adoption of a PACE program.  NRDC also has over 278,000 members in the District of Columbia and the twenty-two other states that have enabled PACE programs.

19. For over two years NRDC has been at the forefront in supporting the development and implementation of PACE programs at the federal, state, and local level. NRDC continues to play a leading role in the national PACENOW Coalition, which advocates for the development of sound and effective PACE programs nationwide and the creation of a legal and regulatory framework that fosters this development. NRDC staff have been invited to provide policy advice to the White House as well as to state and local governments seeking to pass PACE legislation and seeking to design PACE programs. Staff at NRDC have been directly involved in assisting Mayor Bloomberg's office with the design and implementation of a PACE program for the commercial building sector in New York City. In addition, NRDC staff have worked directly with the New York State Energy Research and Development Authority ("NYSERDA") to develop a statewide aggregation model for PACE residential programs in New York State.

20. NRDC brings this action on behalf of its members. NRDC's membership includes individuals who are concerned about the adverse environmental and human health impacts associated with current levels of largely fossil fuel-intensive electric generation. These members recognize that energy efficiency can play a vital role in improving the quality of the air they breathe and reducing the threat of catastrophic climate change. Defendants' actions, which have the effect of terminating existing PACE programs and curtailing the development of new PACE initiatives, will significantly set back efforts to address air pollution and global warming pollution from the electric generation sector. For example, if PACE programs were to achieve a 3% penetration rate nationwide over the next decade, 3.3 million homes would be retrofitted, resulting in approximately 320 million metric tons of avoided carbon dioxide emissions. Assuming an average job cost of $15,000, these retrofits would also result in just under $50 billion of construction activity. Defendants' actions harm NRDC's members who live in the

many areas that are at special risk from climate change (such as coastal areas subject to adverse impacts from sea level rise) or in proximity to polluting electric generating facilities whose emissions could be reduced or eliminated if energy demand were to be reduced through the implementation of PACE energy efficiency financing programs.

21. NRDC's membership also includes individuals who live in jurisdictions that currently have or are contemplating the adoption of PACE energy efficiency programs, including members who are interested in energy efficiency and who would seek to obtain PACE financing for energy efficiency improvements to their homes if this financing were available. These members are injured by Defendants' actions, which have rendered it no longer possible to obtain desired PACE financing for energy efficiency improvements to their homes and businesses.

22. NRDC also brings this action on its own behalf. As an advocacy organization possessing substantial expertise and experience with the development of energy efficiency and energy efficiency financing programs, which has worked for over two years to support the development of PACE at all governmental levels and which routinely submits comments to federal agencies on issues on which the organization is involved, NRDC would have benefited greatly from the opportunity to submit comments on Defendants' July 6 Directives. Defendants' failure to provide for notice and comment prior to issuing their July 6, 2010 Directives deprived NRDC of a right of public participation to which it is entitled under law.

23. Defendant FHFA is a federal government agency.

24. Defendant Edward DeMarco is the Acting Director of FHFA and is sued in that capacity.

25. FHFA regulates Fannie Mae, Freddie Mac and the twelve Federal Home Loan Banks. Together, these government-sponsored enterprises provide more than $5.9 trillion in

funding for the U.S. mortgage markets and financial institutions.  FHFA has also acted as the conservator of Fannie Mae and Freddie Mac since the enterprises were placed in conservatorship in September 2008.

26.     Defendant OCC is a federal government agency within the United States Department of the Treasury.

27.     Defendant John G. Walsh is the Acting Comptroller of the Currency and is sued in that capacity.

28.     OCC charters, regulates, and supervises all national banks, as well as supervising the federal branches and agencies of foreign banks.  As of January 31, 2010, OCC regulated and supervised more than 1,500 national banks and 50 federal branches of foreign banks in the United States, accounting for nearly two-thirds of the total assets of all U.S. commercial banks.

## STATUTORY FRAMEWORK

29.     The APA requires that before an agency promulgates a rule that will affect the rights of individuals it must provide notice to the public and solicit input regarding the new rule. 5 U.S.C. § 553(b), (c); *see also id.* § 551(4) (defining rule), (5) (defining rulemaking). Pursuant to 5 U.S.C. § 706(2)(D), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."

30.     The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

31.     NEPA requires that the agency provide a "detailed statement," also known as an Environmental Impact Statement ("EIS"), on "the environmental impact of the proposed action" whenever an agency undertakes a "major Federal action[] significantly affecting the quality of

the human environment." 42 U.S.C. § 4332(2)(C)(i).  Where an agency does not know whether the effects of its proposed action will be "significant," it may prepare an Environmental Assessment ("EA") in order to determine whether an EIS is required.  40 C.F.R. § 1501.4(b).  If the EA concludes that the action may significantly affect the quality of the human environment, the agency must prepare an EIS.  *Id.* § 1501.4(c).  If the agency concludes based upon the EA that the environmental impacts are insignificant, it must prepare a "Finding of No Significant Impact."  *Id.* § 1508.13.

32. The Federal Housing Finance Reform Act of 2008 established the FHFA and sets forth the scope of its regulatory authority.  12 U.S.C. §§ 4501 *et seq.*  Pursuant to 12 U.S.C. § 4526(a), the Director of FHFA is authorized to "issue regulations, guidelines or other orders necessary to carry out [its] duties."  When issuing regulations pursuant to his section 4526(a) authority, the Director must comply with the notice and comment requirements of the APA. *Id.* § 4526(b); 5 U.S.C. § 553(b).

33. OCC is charged with assuring the safety and soundness of and compliance with laws and regulations of the national banks. 12 U.S.C. § 1.  Pursuant to statute, the Comptroller of the Currency is granted broad authority to prescribe rules and regulations to carry out the responsibilities of his office except where expressly and exclusively granted to another agency. *Id.* § 93a.  In wielding this rulemaking authority, the Comptroller must comply with the APA's substantive and procedural requirements.  5 U.S.C. §§ 551, 553(b), (c), 706.

### STATEMENT OF FACTS

34. PACE programs are a product of state and local law and function in the same manner as traditional special assessments, which have been used in this country for over 100 years to pay for many types of improvements in the public interest, including street paving,

parks, open space, water and sewer systems, street lighting, and seismic strengthening. Once a state has enacted PACE authorizing legislation, local governments can utilize their taxing power through land-secured financing to develop programs to finance privately-owned energy efficiency and renewable energy projects.

35. Under a typical PACE program, the local government issues special revenue bonds, and the proceeds from these bonds are made available to interested commercial and residential property owners to fund the upfront costs of energy efficiency and small scale renewable energy improvements.

36. In exchange for receiving the upfront cost coverage, individuals who opt to use a PACE program agree to an incremental charge on their property taxes over a period not to exceed the useful life of the financed improvements. Because the PACE assessment is attached to the property, the tax lien remains on the property if it is transferred or sold.

37. Recognizing the many potential benefits afforded by PACE programs, twenty-three states and the District of Columbia have enacted PACE-enabling legislation or otherwise authorized PACE programs, and numerous local governmental entities have implemented or are considering implementing PACE programs. In New York State, at least twenty-four villages, towns, and cities and three counties have implemented or are considering implementing PACE programs. These include New York City, Babylon, Bedford, Binghamton, and Ithaca, and Nassau and Tompkins Counties.

38. On May 5, 2010, Fannie Mae and Freddie Mac issued lender letters advising that PACE assessments were "loans" and, as such, could not attain seniority to existing mortgages without violating Fannie Mae and Freddie Mac's Uniform Security Instruments. Both Fannie

Mae and Freddie Mac indicated that they would issue additional guidance to lenders as appropriate.

39. Only two days later, on May 7, 2010, DOE issued a set of best practice guidelines for local governments seeking to design PACE programs and underwriting criteria to reduce the risk of default and impairment to the property's mortgage holders. As DOE explained, "[t]hese best practice guidelines are significantly more rigorous than the underwriting standards currently applied to land-secured financing districts" and "provide an extra layer of protection to both participants who voluntarily opt into PACE programs, and to lenders who hold mortgages on properties with PACE tax liens."

40. On July 6, 2010, FHFA issued a Statement on Certain Energy Retrofit Loan Programs. FHFA's Statement asserted that it was made "[a]fter careful review and over a year of working with federal and state government agencies." The Statement purported to make a number of factual findings regarding the risks posed by the first lien status of PACE assessments including that: (a) PACE assessments "do not have the traditional community benefits associated with taxing initiatives"; (b) first liens for PACE assessments "are not essential for successful programs to spur energy conservation"; and (c) first liens for PACE assessments "present significant risk to lenders and secondary entities." The Statement also asserted that PACE assessments are "loans." FHFA's Statement offered no basis for any of these factual assertions. Moreover, the factual assertions are incorrect.

41. First, PACE assessments provide a number of significant community benefits. These benefits include accelerating local investment in energy efficiency, stimulating the local economy by reducing energy bills and creating jobs, contributing to success in meeting local energy efficiency targets, mitigating the risk of global climate change impacts and decreasing

11

other forms of air and water pollution by reducing the need for energy generation, and increasing energy security.

42. Second, first lien status is critical to the success of PACE programs. By design, PACE assessments are small in relation to the total value of a property, constituting less than 10% of the total value of the property pursuant to DOE's May 7, 2010 PACE guidelines. In contrast, many mortgages are made at 80-90% of the value of a property. In the case of a foreclosure, the property value has often decreased, resulting in insufficient proceeds to make the existing mortgage holder whole, leaving no money to pay off any secondary liens. Where this occurs, the subordinated lien is eliminated, and the junior lienholder suffers a loss. Because of the risks associated with subordinated liens, there is currently almost no demand in the secondary market for conventional junior mortgage instruments. Eliminating priority lien status for PACE assessments would render them effectively impossible to finance through the capital markets.

43. Third, due to their small size and cash flow positive design, PACE lien seniority is immaterial to holders of the underlying mortgages. PACE financing is typically cash flow positive because PACE programs are designed (per the DOE Guidelines) to have annual aggregate energy savings exceed the cost of annual aggregate PACE assessments. Because the property owner's cash flow position is improved, the owner is in a better position to make mortgage payments and less likely to default. Moreover, since PACE improvements have a positive net present value, they increase the value of the lender's collateral, which improves the loan-to-value ratio, benefiting the lender as well. In the event the owner does default, the lender's risk is further mitigated because only the delinquent portion of the PACE financing is paid out of the foreclosure proceeds ahead of the existing mortgage; the remainder of the PACE financing is not accelerated and runs with the property (along with the benefits of the energy

savings generated by the improvements). Thus, for example, if a home is subject to a $20,000 (6% interest rate) 20-year PACE lien that is paid off $1,700 per year for 20 years and the owner defaults with one year of PACE payments in arrears, then only the single year of back payment – i.e., $1,700 – would be paid ahead of the mortgage, not the full $20,000.

44. Finally, PACE assessments are not loans. Rather, PACE assessments are special assessments that fall within the well established authority of local governments to provide land-secured financing for public improvements.

45. Nevertheless, based on what FHFA perceived to be the risks associated with PACE assessments, the agency's Statement called for an effective end to PACE programs and directed Fannie Mae, Freddie Mac, and the Federal Home Loan Banks to take a number of actions that curtailed the availability of PACE assessments with first lien priority. Fannie Mae and Freddie Mac implemented FHFA's July 6 directive through guidance documents issued on August 31, 2010 that stated that Fannie Mae and Freddie Mac would not purchase mortgages secured by properties subject to PACE assessments that provide for lien priority over first mortgage liens, effectively denying the benefits of the secondary market to properties that participate in PACE financing programs.

46. On July 6, 2010, the OCC also issued a statement in the form of a bulletin to CEOs and other personnel at all of the national banks. OCC attached to its Bulletin FHFA's July 6 Statement. The OCC Bulletin stated that the first lien status of PACE assessments "raises significant safety and soundness concerns." The Bulletin directed the national banks to "take steps to mitigate exposures and protect collateral positions." The actions directed by OCC effectively preclude homeowners with first lien priority PACE assessments from obtaining mortgages (or refinancing mortgages) through any of the national banks.

13

47. Defendants' July 6 Directives both constituted rules pursuant to the APA that required the agencies to engage in notice and comment rulemaking. Neither Defendant, however, engaged in the required notice and comment procedures before issuing the July 6 Directives.

48. Moreover, neither Defendant undertook any type of environmental analysis of the impacts of the July 6 Directives prior to issuing the Directives.

### FIRST CLAIM FOR RELIEF

(Violation of APA, 5 U.S.C. §§ 551(4), (5), 553(b), (c), 706(2)(D), 12 U.S.C § 4526(a))

49. Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint as if fully set forth herein.

50. Defendants' July 6 Directives are "rules" affecting the rights of individuals within the meaning of 5 U.S.C. §§ 551(4) and 553.

51. Neither FHFA nor OCC complied with the requirements of the APA in promulgating these rules. 5 U.S.C. §§ 551(5), 553, 12 U.S.C. § 4526(a).

52. Because Defendants' July 6 Directives were issued without observance of procedure required by law, 5 U.S.C. § 706(2)(D), this Court must hold the directives unlawful and set them aside. *Id.* § 706(2).

### SECOND CLAIM FOR RELIEF

(Violation of APA, 5 U.S.C. § 706(2)(A))

53. Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint as if fully set forth herein.

54. The stated bases for Defendants' July 6 Directives consisted of a number of unsubstantiated factual assertions regarding the purported risks and benefits associated with PACE financing programs. Many of these factual assertions are erroneous.

55. Because Defendants' July 6 Directives rely on unsupported and inaccurate factual bases, Defendants' actions in issuing their July 6 Directives were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and this Court must hold the directives unlawful and set them aside. *Id.* § 706(2).

### THIRD CLAIM FOR RELIEF

(Violation of NEPA & APA, 42 U.S.C. § 4332(c), 5 U.S.C. § 706(2)(A))

56. Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint as if fully set forth herein.

57. NEPA, 42 U.S.C. § 4332(2)(c), requires all federal agencies to prepare an environmental impact analysis in the form of an EA or EIS for any major federal action that may significantly affect the quality of the human environment.

58. Defendants, federal agencies, failed to conduct any form of environmental impact analysis in promulgating their July 6 Directives.

59. Defendants' actions in issuing their July 6 Directives have curtailed or eliminated PACE financing programs around the country, eliminating the significant energy savings that these programs would have generated, and necessitating either the addition of new electric generating capacity or the continued operation of existing electric generation that would otherwise be unnecessary. Either scenario could significantly affect the quality of the human environment.

60.     Defendants' failure to comply with NEPA in issuing their July 6 Directives renders Defendants' actions "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA.

## PRAYER FOR RELIEF

Plaintiff NRDC requests that this Court enter a judgment:

(1)  declaring that Defendants have violated the APA by failing to comply with the APA's notice and comment procedures in promulgating their July 6 Directives;

(2)   declaring that Defendants have violated the APA by arbitrarily and capriciously basing their July 6 Directives on arbitrary, inaccurate, and unsubstantiated factual assertions regarding the benefits and risks associated with PACE programs;

(3)  declaring that Defendants have violated NEPA and the APA by failing to conduct an EIS or otherwise determine that an EIS was not required before issuing their July 6 Directives;

(4) ordering Defendants to vacate their July 6 Directives and ordering FHFA to instruct Fannie Mae and Freddie Mac to issue new Guidance to their Seller/Servicers requiring that they take no adverse action against any mortgagee who is participating in, or may participate in, a PACE program;

(5)  awarding Plaintiff its litigation costs and reasonable attorneys' fees in this action; and

(6)  ordering such other relief as the Court may deem just and proper.

Dated: October 7, 2010
      New York, NY

Respectfully submitted,

s/ Katherine Kennedy
KATHERINE KENNEDY
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
Phone: (212) 727-2700
Fax: (212) 727-1773
Email: kkennedy@nrdc.org

Counsel for Plaintiff